May it please the court, Cheryl Gordon MacLeod on behalf of Mr. Casas. Mr. Casas received sentences of 200 months on counts 1, 11, and 14, and he received sentences of 48 months on the dozen 843B facilitation counts. He's been incarcerated since January of 2007, so he's essentially done his 48 months. So although the court's original order mentioned briefing the 843B counts, and while I'm happy to discuss the fact that the 843B counts should be vacated due to insufficiency of evidence of facilitation, especially given the government's concession in its response brief that the Fifth Circuit's Gonzales- Rodriguez decision was correctly decided and limits the definition of facilitation, and while I'm happy to discuss that the other facilitation counts should be dismissed because the jury instructions broadened what the indictment charged, my preference, absent contrary direction from the court, is to focus on the errors that affected counts 1, 11, and 14, because they're the big ones that carry the 200-month terms of imprisonment. Those basic issues are the Crawford issue and the multiple conspiracies issue. With respect to the we have basically three categories of evidence that were out-of-court testimonial declarations and documents that were admitted into evidence over objections. That was the known print, or more accurately, the testimony linking the known print to Mr. Casas. That was the ICE, Exhibit 56, or more accurately, the testimony about the amount, nature, and purity of the ICE and its chain of custody. And Category 3 is the cocaine, Exhibit 48, same thing, testimony about its nature, amount, purity, and its chain of custody. And I'd like to go quickly through each of those categories to show why they were, why what was admitted was both out-of-court declarations and testimonial. I guess, I guess I'm, I'm understanding that what you're suggesting that this is a Crawford error. Correct. So therefore I know what my analysis is, but even under a Crawford error and an analysis that I would undertake under Crawford, don't I also have an extra part of the analysis, and that is that it's harmless error analysis? Yes. Harmless error beyond a reasonable doubt, Your Honor, as the government agreed in its response brief. Okay. Well, it would be that it had a substantial and injurious effect. Well, we're here on... Direct appeal, that's right. We're here on direct appeal, thank goodness. Not like the last case. Our standard. So I think it's the basic Chapman harmless beyond a reasonable doubt standard, and I think the government acquiesces in that. So let me get to that. I mean, I guess the reason I put that up there is because if you want to go through the evidence, it seems to me that there are three different things which you're going to have to really go after, and that is, as I read the record, the government introduced testimony. In fact, one might even clarify it as extensive testimony concerning the chain of custody and the DEA procedures, ensuring the integrity of the evidence. And so I guess in that instance, I'm trying to figure out if I get to harmless error anyway. Well, I think the question you're asking... Okay, let me... I mean, I'm really saying even if right, I'm not sure you're right, but even if right, is it not harmless error? Let me start with the print, because I think that's the easiest argument for me. What happened with the print is that somebody took a print from somebody, and somebody else got it to the expert, Mr. Shull, and Shull was the one who testified in court that the print came from Mr. Casas, and it matched a separate print on a CD, plastic CD case, from this suitcase that supposedly had the cocaine in it. There was nobody else who testified about that known print having come from Mr. Casas. So the government doesn't even argue that it was cumulative of anything else. The government's sole argument with respect to the print is that it was harmless because there was so much other evidence connecting Casas to that specific bag of cocaine. They named two bits of evidence. The first is a telephone call that supposedly mentioned the cocaine, and the second is the Jones testimony. Jones, or L.T. Gray, was the courier who was carrying it. Well, if you look at the transcript of the telephone conversations, you'll see that they never talk about cocaine. They're talking about... Which date does the government rely, which transcript? I don't think they specified which date. None of the telephone conversations talk about a specific drug. They talk about burritos or tacos, and it required somebody to interpret that for the jury to say that such and such meant drugs. Well, who interpreted that for the jury? The main guy was Jones. So when the government says that there were two other sources, the telephone calls and the Jones testimony, really if you collapse it, it's just one source. It's Jones testimony on the stand, and it's Jones testimony on the stand saying, in that conversation we were really talking about cocaine. Well, how reliable is Jones compared to that print? Jones was a co-conspirator, a bought-and-paid informant. I've cited the cases in the brief that say that that type of testimony is notoriously untrustworthy. I submitted a supplemental authority yesterday on the Ocampo v. Eldon Vale case, which says exactly the same thing, that with that Crawford error, the snitch testimony that was left after you took away the Crawford error was not sufficient to prove the error beyond a reasonable doubt. We even have a jury instruction in this case, jury instruction 14, that told the jury the snitch testimony, the testimony of Mr. Casas should be taken with special care because he was testifying for a deal. So the question with the print is whether the Jones testimony, and the government cited nothing else, is sufficient to prove the admission of the print harmless beyond a reasonable doubt. And I'd say that under the Ocampo case and under the other decisions saying that snitch testimony is inherently untrustworthy, the answer has to be no. That missing print essentially changed what would be a snitch accusation case on the cocaine to a CSI case. And we all know that the CSI case is far more compelling. Let me get to the other written reports. The written reports on the weight and the nature of the ice in the cocaine. The government says that those are just cumulative of what Ms. Chang testified to at trial. Cumulative might be one way of characterizing it. Bolstering would be the way that I would characterize it. Those were reports as admitted as evidence and verbal words that Ms. Chang used when she said Chappell found this and Rucker found this on the cocaine and then on the ice. So it was out-of-court testimony from other government FBI agents bolstering the in-court testimony. I think bolstering is the better, and I think that constitutes impermissible vouching rather than just being cumulative. The final thing is the chain of custody. Actually, the testimony that you're referring to was extensive, but it was not firsthand. They had a special agent Wheeling who came in at the end. He was the standard operations procedures guy. He was the one who testified that typically it comes in, it's checked in, and it's put on this list. But he didn't have any firsthand knowledge about this case. He also gave testimony about the conditions of the evidence, but it was conclusory. He said when these procedures are followed, we assume that the evidence is in the state that it was in when it came to us. But he didn't have firsthand knowledge in this case. So while there was extensive testimony submitted on the chain of custody, it wasn't firsthand. And that's most clear from the fact that with respect to the cocaine, Ms. Chang acknowledged that there were about 20 people who touched that cocaine on its five trips back and forth between the time it came into court. What came into court was what Officer Cologne called his DEA 7A Exhibits 20 and 21, and a DEA document called Exhibit 62, which were the chains of custody. So I disagree with your conclusion that those documents coming in was harmless because there was other extensive testimony. The testimony of the people with firsthand knowledge actually didn't come in to evidence. Let me ask you something about, okay, suppose we accept your argument as to the fingerprint. How does that change any of the convictions, given that he was convicted for multiple drugs on those counts? Well, the main counts I'm concerned with are 1, 11, and 14. One is the So it directly affects 14, which is cocaine. So it's a substantive count. It's a substantive crime. Okay. So not the conspiracy. So how would that affect, ultimately, the 200-month sentence? Well, I've got other arguments, but with regard to the print in particular, I think it affects 14 and 1. It affects 14 because that's a substantive cocaine count. It affects 1 because it was a multi-object conspiracy. If we're in favor that there was legal error with regard to the admission of cocaine, then we've got a legal error in terms of one of the objects of the conspiracy, and we go back to United States v. Yates and United States v. Griffin. Yates held that where there's a general verdict of guilty, as there was here on the conspiracy, it's unclear what the jury found as the basis of the conspiracy, and one of the possible bases for the conspiracy conviction was legally invalid as opposed to based on insufficiency of the evidence. You can't guess. The remedy is reversal. So I think that's how we get rid of conspiracy count 1. How do we get rid of count 11? The spillover effect of the problem with the cocaine on count 14, the cocaine as it affected count 1, and the multiple conspiracies problem as it affected count 1. The other way we get rid of the 200-month sentence on that is the sentencing errors. There were two key sentencing errors, and they both affected the length of the sentence. One was the judge's failure to recuse after having previously determined in the girlfriend Cardenas' case that Casas was a leader, and then applying a four-level enhancement in Mr. Casas' case for the same leadership role. Now on that particular argument, we're really talking about plain error, are we not? We are talking about plain error, but I do want to say that in Olano, the plain error case, there's a paragraph that reserves that plain error is not necessarily applicable to all trial errors, that there are some that are so fundamental that even... I appreciate your argument around it, but I guess at this particular situation, I don't know what, because you say his name is Casas? Casas. Oh, Casas, sorry. I don't know what Casas did to provide me the idea to if you will, suggest this is any more than plain error. I mean, they had a chance at trial to do what they could do to make it other than plain error, and they didn't. Well, let's apply a plain error review. So I have to show that it was error and that it was plain. Plain means clear from the record, and I've supplied the Cardenas transcript of sentencing and the Casas transcript of sentencing. Is it error that it was, it's not only error, but a biased judge is PSR recommended a four-level enhancement for the role. The judge merely adopted the enhancement. The judge's findings are key, and we've got lots of law saying that the judge's adoption of the PSR makes it her own, and she can't... Well, did your client ever contest the factual statements in the PSR? Your Honor, I'd have to get back to that, and... I don't think they did. They contested the leadership enhancement. Well, that was it, but I mean, what we're really talking about here is, in my book, well, I guess you'd have to point me to the record where your client contested the factual statements of the PSR. Well, I think what you're asking me about, and I will look for that in the record after the argument, but I think what you're asking me about is whether this is an error that was harmless. If the judge was biased, then under Fulminante, and even under the Caperton v. Massey case, it's a structural error, and you don't get to ask what was the other evidence. It's not a harmless error inquiry. It's an inquiry for which prejudice is presumed, and that's true even under plain error review. The Jimenez-Racio case that I've cited in the briefs says that if it's a prejudice-presumed type of error, like biased judge, then that automatically satisfied that third Olano prerequisite, whether substantive rights were prejudiced. Well, and I understand where you're going. I guess I haven't quite got my arm around the fact that the judge was biased or prejudiced, but I'm giving you credit for that argument, and I'm just looking at the realities of what I've got to look at. Let me just say that under Caperton, it's not a subjective inquiry. I'm not arguing that she carried a subjective bias. It's objectively whether a reasonable observer could think that because she prejudged this in the Cardenas case that it affected her judgment in the Casas case. I understand your argument. I'm not sure it's prejudged simply because she is the judge there and has to make some determination in that particular case. Thank you, Your Honor. I'm in a deficit, so I'll beg for a few more seconds later. Okay. Thank you. Good morning. May it please the Court, my name is Susan Cushman. I'm an assistant U.S. attorney in Hawaii, and I was trial counsel in this case. And I just want to start off by addressing a few points that Ms. Gordon-McLeod brought up. First of all, with respect to the print, it wasn't just Brian Joshua Jones who was talking about Jorge Casas' involvement, but we had Mr. Ruiz, who was a co-defendant, and whose phone was ultimately the one that was intercepted, explaining to the jury that burritos and tacos and windows, windows were methamphetamine, burritos, tacos, those were spurred to specific weights of cocaine. And there's extensive phone calls that were talking about arranging this transport of cocaine with the courier, Brian Joshua Jones. So, we have Mr. Ruiz sort of setting the groundwork, if you will. And then Mr. Jones comes and testifies and says that Jorge Casas had contacted him, he had made multiple trips from before to Maui with cocaine, and he had contacted him on April 13th with respect to this specific trip asking him to go. So, the agents who were listening on the Title III heard the phone call and they were alerted that he was coming through. And then on April 16th of 2000, they stopped Brian Jones at the airport in Honolulu with the six kilograms of cocaine. So, what I'm trying to say to summarize here is you have the defendant's own admission talking about the cocaine coming to Maui, and then you have Mr. Ruiz talking about it, and you have Brian Joshua Jones testifying it, and then it's ultimately corroborated by the seizure of the cocaine in Honolulu. So, I would argue with all that, the known print was error, I've admitted that, but it was error, it was harmless beyond a reasonable doubt, and did not contribute to the conviction. I think ultimately... Conducted before or after Crawford was issued? I think the trial was in 2006. I had just come to the U.S. Attorney's Office, and I think it was, I think Crawford was kind of right around that time, but it was still sort of new. I want to say maybe within a year, one way or the other. So, you probably, if you were aware of Crawford and all its implications, would have handled this evidence differently? Yes, I would have, Your Honor, and this is a little bit outside the record, but I come from the U.S. Attorney's Office in Washington, D.C. I was prosecuting different kinds of cases at that point, and this was my first drug case in this jurisdiction, and I admit that it was error, but again, there's overwhelming evidence of his involvement, and I think the most compelling thing is his own voice on the phone talking about the drugs that were coming, and then of course the drugs show up. So, it was the, and the drugs that showed up included cocaine? There was the six kilograms of cocaine that they had been talking about. I mean, the trial sort of starts out with, you know, Casas calling up, this is in count, I'm sorry, Exhibit 13, the intercepted phone call, which I believe is in the excerpts of record. Just give us the date of this telephone call. It's excerpts of record 561. Which date for the telephone call? April 13th of 2000, so that's the first phone call that Casas makes looking for, he calls up Ruiz and he says, hey, where's our courier, Brian Jones, I was looking for Jones because he's got the cocaine, it's ready to go and it's going to come. And then there's a series of other phone calls where they're sort of, you know, Ruiz says, I don't know, I'll find him, and then Casas tells Ruiz to call another guy named Furman Rivera, that's an excerpt of record 561, he calls Furman Rivera, Furman Rivera gives him a connecting phone call for Jones, then Jones, then Ruiz calls Jones and Jones says, I'm on my way with the kids, I'm going to go pick up the kids, and Jones testifies, that's the code he uses for cocaine. It should be no surprise to this court that, of course, people don't mention cocaine on a phone, they always talk about kids or windows for methamphetamine, here it was burritos and tacos for different weights. And then, of course, there are also numerous intercepted phone calls regarding, you know, the methamphetamine that's picked up at the airport in Las Vegas involving the two female couriers, and that's the subject of count 11, the other substantive count. And again, those phone calls were very specific, there were very specific phone calls between Jorge Casas and Mr. Ruiz, Felipe Ruiz, the cooperator, one of the cooperators for the government, and they were talking about what was the best route to send the women through, what airport they should go through, you know, they didn't want them to go through L.A. because that's a hot airport, they thought it was better to go through San Francisco, it was a little quieter, but those were all intercepted phone calls. And again, the agents heard about those phone calls and they went to the court, and they arrested both the two female couriers, Carla Cajal and Mona Huihui, and they seized two pounds of methamphetamine from their luggage. So again, we have phone calls, it's not just the say-so of the informant, it's corroborated by the seizure of evidence of what they were talking about on the phone. So I would submit, based on the evidence that came in at trial, both counts 11 and 14, this court should affirm, based on the overwhelming evidence. The other area that counsel began to address and didn't really get into was the multiple conspiracies instruction. And again, the Liu case says that with a lone defendant, they're not entitled to a multiple conspiracies instruction, and he was a lone defendant in this case, ultimately because he had been a fugitive for five years and was picked up coming across the border in California. So by that time, most of the other defendants had pled or gone to trial, and so that was what remained. He was the only one that remained, and as such was a lone defendant. There was no room for confusion with the jury. Again, it was a streamlined trial just involving him and testimony about cocaine and methamphetamine. Were Jones and Ruiz both serving time at that point? Both of them, when I tried the case, both Brian and Joshua Jones, both of them were in halfway houses. So they were out at that point, yes. But they had, both of them had served prison sentences. So based on the evidence and the record in this case, I would request that the court affirm the convictions and counts 1, 11, and 14. If the court has no further questions for me, then I will sit down. I have no questions. All right. Thank you very much, counsel. Thank you. May I have another minute or two, Your Honor? Thank you. Crawford was decided in 2004. The judgment in this case was entered in July of 2007. It was clearly on the books at the time of the trial. Melendez-Diaz, which said that those cocaine reports, lab reports, are also subject to Crawford, was just an application of Crawford. As I anticipate that the Bull Cumming decision, which the Supreme Court has before it now and will probably be decided in a week or two, will also be an application of Crawford. The government says that it wasn't just Jones who talked about the burritos. It was also Ruiz Castro. Same problem there. He's a snitch witness, so everything I said about Jones also applies. What about the fact that Casas himself was having conversations about the cocaine and then the corroboration of the seizure of the drugs? He was having conversations. They needed the co-conspirators to explain what the conversations were about. The seizure could corroborate it if you credit the fact of the interpretation of custody and all the rest of it on the cocaine. The leadership objection was made in the sentencing transcript at pages 25 to 28 and in the excerpt of record at page 819. And I'd like to respond. 25, 28? Sentencing transcript pages 25 to 28, which I think is excerpt of record at 819 and following. And with regard to the Lew case and the Anguiano case on the multiple conspiracies instruction, supposedly holding that the multiple conspiracies instruction applies only when there's multiple defendants, that's not exactly what they say. They say it generally applies when there's multiple defendants. Anguiano explicitly uses the term generally and Lew cites to Anguiano. In those cases, they focus on the spillover effect and say there's no spillover possibility when there's only one defendant on trial. But both cases also recognize that there's two other protections that a multiple conspiracies instruction offer. One is the problem of no notice to the defendant and the other is the problem of constructive amendment. In those two cases, they explained why those problems were not at issue. I think in the other arguments I've made in my case, I've explained why especially the constructive amendment problem was at issue. So the limitations of Anguiano and Lew are only a general rule and don't specifically apply to this case. Thank you, Your Honor. All right. Thank you very much, counsel. United States v. Cassas is submitted.
judges: Alarcon, Wardlaw, Smith N. R.